

The following constitutes the
Memorandum Decision of the Court.
Signed July 30, 2018

_____

Roger L. Efremsky
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

In re

FATIMA BULGUCHEVA,
IBRAGIM BULGUCHEV,

        Debtors.

_____/

KHALIMAKHAN TAKHTAYEVA,

        Plaintiff,

vs.

FATIMA BULGUCHEVA,
IBRAGIM BULGUCHEV,,

        Defendants.

_____/

Case No. 15-42285 RLE

Chapter 7

Adversary No. 15-4118

**Trial Date:** December 1, 4, 5,
6 and 7, 2017
**Time:** 9:00 a.m.
**Length of Trial:** 5 days

## MEMORANDUM DECISION AFTER TRIAL

1

## I.   Introduction

Plaintiff, Khalimakhan Takhtayeva (hereinafter, "Plaintiff") initially sued Defendants Fatima Bulgucheva (hereinafter "Fatima") and Ibragim Bulguchev (hereinafter "Ibragim") (together, the "Defendants") in 2015 in state court for money Plaintiff lent Defendants between 2004 and 2009.  Several months later, Defendants filed for bankruptcy relief under chapter 7 of the Bankruptcy Code.[1]  In response to the bankruptcy filing, Plaintiff filed the current adversary proceeding seeking to have the debt determined to be nondischargable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6), and seeking to have Defendants' discharge denied pursuant to 11 U.S.C. §§ 727(a)(4)(A), (a)(5) and (a)(6)(A).[2]

## II.  Rule 52(c) Motion

At the conclusion of Plaintiff's case in chief, counsel for Defendants brought an oral motion under Federal Rule of Civil Procedure 52(c), which is incorporated under Bankruptcy Rule 7052, for Judgment on Partial Findings.  The court took the

_____

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.  All "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2]The court notes that Plaintiff's complaint references inconsistent Code sections.  The complaint caption refers to 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6)(A); and 11 U.S.C. §§ 727(a)(4) and (a)(6).  The claims for relief in the body of the complaint reference 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6)(a); and 11 U.S.C. §§ 727(a)(4)(A) and (a)(5).  The prayer refers to 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6)(A); and 11 U.S.C. §§ 727(a)(4) and (a)(6).

motion under submission. For the reasons stated herein, the court grants the Rule 52(c) motion. These are the court's findings of fact and conclusions of law as required by Rule 52.

**III. Findings of Fact**

    **A.   Plaintiff**

    Plaintiff resides in Almaty, Kazakhstan. She is well-educated, holding degrees in English and Economics. She speaks no less than six languages. She was a very successful businesswoman and entrepreneur. At one time, she co-owned and operated with an American partner, a business in Kazakhstan that employed over one hundred employees engaged in the sale of frozen chicken parts. Later, Plaintiff owned and operated an olive oil business in Spain, where she bought land and built a home. Additionally, Plaintiff bought and sold real property in Kazakhstan. Plaintiff also purchased real property in London, England for her daughter. Plaintiff's most successful business venture was owning and operating a furrier business in Kazakhstan, known as Winter Fantasy. The business not only manufactured fur garments, but specialized in refrigeration for storing furs and dry cleaning furs and leather garments. Plaintiff traveled extensively throughout Russia, France, Great Britain and Hong Kong, attending fur exhibitions. Winter Fantasy enjoyed elite clientele from around the world.

    In 2005, Plaintiff sold Winter Fantasy. In 2007, Plaintiff opened a new business called Takha, which specialized in the cleaning and storage of fur and leather garments. Plaintiff ran

this business until 2017.  Plaintiff is now retired.[3]

**B.  Defendants**

Fatima is also from Almaty, Kazakhstan.  She graduated from the Institute of Food Industry in Kazakhstan.  She holds no degree in accounting, nor does she have any formal training as an accountant.

Defendants married in 1984.  In 1996, they moved to Greece. While there, Fatima had a small business where she would buy fur coats in Greece, and then re-sell them in Russia or Kazakhstan. The business was not successful and Fatima closed it in 1999. This was the same year that Defendants and their three young children immigrated to the United States.

Fatima's first job in the United States was as a housekeeper at a Hilton hotel.  She later went to work for a small janitorial business that employed ten people, including Fatima.  Several years later, Fatima acquired the business for a small sum of money.  Fatima ran the business for a short period of time under the dba Comfort Palace.  In approximately 2002, business slowed and Fatima closed Comfort Palace.  Thereafter, Fatima stayed home to raise the children.

Ibragim is also from Kazakhstan.  He graduated from construction college there.  After graduation, he worked in Kazakhstan doing industrial and civil construction.  Since immigrating to the United States, he has worked in construction.

---

[3]During the trial, Plaintiff and Defendants all testified in Russian.  The testimony was translated by a certified Russian interpreter.

4

In addition to working for a contractor, Ibragim built up a loyal clientele doing handyman and small construction jobs on the side. Ibragim, however, does not hold a California contractor's license. Although he has taken the test to become a licensed California contractor several times, he has never passed it due to his difficultly in reading and understanding English.[4] Between 2001 and 2004, Ibragim was earning approximately $150,000 per year to support his family.

**C. Background**

Plaintiff and Fatima first met in the mid-1990s through the furrier business. Years later, after Defendants immigrated to the United States, Plaintiff and Fatima reconnected and began communicating with one another over the phone on a regular basis.

In or about 2001, Plaintiff visited Fatima and her family at the home that Defendants were renting in Pleasanton, California.[5] At that time, Fatima was running her janitorial business and Ibragim was working for a contractor doing construction work. At trial, Plaintiff testified that she thought Defendants were financially well-off in 2001.

The record is clear that at one time, Plaintiff had a close relationship with Fatima and her family. Plaintiff visited with Defendants each year between 2001 and 2011, they went on

---

[4]Ibragim has not, at any time relevant herein, held himself out as a licensed California contractor to Plaintiff. This is not an issue in this case.

[5]Plaintiff had been in the area a year or two before, visiting one of her clients, a Vice President of Chevron Oil Company, in San Ramon, California.

5

vacations together, and Plaintiff was invited to Defendants' daughter's wedding in Alamo, California in 2008.

In July 2003, Defendants purchased their first home, located at Casa Grande Drive in San Ramon, California. They paid little or no money down.[6] The family income at that time was approximately $150,000 per year.

In the latter part of 2003, Plaintiff and Fatima reached an arrangement whereby Plaintiff would lend money to Defendants. In return, Defendants would acquire real properties (homes) and either demolish and rebuild them or remodel them, and then attempt to re-sell them at a profit, repaying Plaintiff from the sale proceeds.[7] It is unclear from the record who approached whom first with this business venture. Plaintiff testified that it was Fatima who approached her first. Fatima testified that Plaintiff approached Fatima first as Plaintiff wanted to invest her money held in Kazakhstan, in the United States. Ibragim testified that his understanding of the arrangement was that Plaintiff would provide the money, Fatima would act as the bookkeeper, and Ibragim would provide his labor and manage the construction projects.

Based on the record, there is no disagreement that Plaintiff and Defendants had no up-front discussions and reached no

---

[6]See Parties' Joint Stipulation of Facts, Docket #90, Stipulated Fact #5, Exhibit A.

[7]The court characterizes this arrangement as an ill-defined lending arrangement. Plaintiff, at times, referred to it as a real estate venture.

6

agreements as to: (1) how much money Defendants would borrow from Plaintiff; (2) how many or what real properties would be acquired; (3) how the purchases would be financed; and/or (4) the budgets for the proposed construction projects. Moreover, there was no discussion of the terms and conditions of repayment to Plaintiff, except for the vague promise that she would be repaid from sale proceeds when the property or properties were sold. Equally astounding, but clear from the record, is that there was no writing setting forth the parties' respective responsibilities under the arrangement. Nor was there any writing as to how funds would be advanced; whether a written request for funds first be required setting forth the amount requested and the purpose; whether copies of real estate purchase contracts or copies of invoices for materials and/or labor had to be produced prior to receiving funds, or at some point thereafter; and/or whether loan proceeds were required to be deposited and held in any specific account. Moreover, there were no restrictions on the use of the funds once advanced.

At trial, Plaintiff testified that no interest was initially charged on the loans, and acknowledged that the funds she provided to Defendants between 2004 and 2009 were advanced without any instructions regarding how the funds should be used and without any requirements that the funds be deposited and/or held in any specific account. Specifically, at trial Plaintiff testified as follows:

> Question: Before you lent any money to [Defendants], did you
> and Fatima and Ibragim put together any kind of

7

```
                     written agreement that defined your respective
                     responsibilities?

        Answer:   No.

        Question: No?  Were any such agreements entered into between
                     you and [Defendants]?

        Answer:   No.

See Trial Transcript, Day 1, at 152:19-25 and 153:1.

        Question: So the basic understanding that you testified that
                     you had with [Defendants] was that they would buy
                     property, demolish or remodel the property, and
                     then resell the property?

        Answer:   Yes.

        Question: And then pay you back?

        Answer:   Yes.  With profit.

See Trial Transcript, Day 1, at 154:1-6.

        Question: We're now talking about interest.  There was no
                     interest charged on the loans; is that correct?

        Answer:   No.

See Trial Transcript, Day 1, at 154:11-13.

        Question: Restating the question, there was no interest
                     provision on any of the loans that you made to
                     [Defendants] relating to the real properties that
                     they purchased - -

        Answer:   No.

See Trial Transcript, Day 1, at 156:11-14.

        Question: Thank you.  And when you made the transfers
                     between 2004 and 2009 relating to the real
                     properties, you never told [Defendants], you never
                     gave them any instructions as to how to use that
                     money, did you?

        Answer:   No.[8]
```

---

[8]For completeness of the record, the court notes that
Plaintiff called Dr. Napalkov as a witness.  Dr. Napalkov

Question: Nor did you instruct them as to whether they had to put that money in any particular account?

Answer: No.

<u>See</u> Trial Transcript, Day 1, at 156:11-22.

At trial, Plaintiff made it quite clear that she did not want to be involved in Defendants' business activities. Specifically, in response to her own counsel's question, the following exchange occurred:

Question: Did they tell you they wanted to do something about like formalizing your relationship with them?

Answer: I always told them this is not my business, I'm not a participant in it. I wouldn't be able - - I wouldn't be able to oversee it. I live in a different country, in Kazakhstan, and not in America.

Question: Okay.

<u>See</u> Trial Transcript, Day 1, at 80:21-81:2.

Additionally, while being cross-examined by Defendants' counsel at trial, Plaintiff acknowledged that the first time she discussed any division of profit with either Defendant was not until 2011. Specifically:

Question: So, my question, again, goes back to the fact that the first time that you made reference to a division of profits is in 2011.

---

testified that he, too, made loans to Defendants. Further, like Plaintiff, Dr. Napalkov testified that he put no restrictions on the use of the funds he lent to Defendants. Unlike Plaintiff, however, Dr. Napalkov had signed promissory notes, which provided for accrued interest at 10% per annum, all due and payable within one year, regardless of whether Defendants sold any of the real properties. The court found this testimony to have little to no relevance to the facts surrounding the transactions between Plaintiff and Defendants.

9

Answer:  Probably.
See Trial Transcript, Day 1, at 158:25-159:3.

Equally clear from the record is the fact that at no time did either Defendant make any representations to Plaintiff, either orally or in writing, regarding their net worth or whether they purchased their first home outright.  They also made no representations to Plaintiff that any of the properties purchased with Plaintiff's funds would be purchased outright.

At trial, evidence was introduced that the funds lent by Plaintiff to Defendants were sent via wire transfer from Plaintiff's account in Kazakhstan to Defendants' bank account at Wells Fargo Bank in the United States.  The funds were either wired by Plaintiff, or by her son or her driver, who were both described as Plaintiff's agents.  It appears to the court that the transfers were in increments of less than $10,000 each. See Trial Transcript, Day 2, at 15:4-23.  According to Plaintiff, the wire transfers of funds were in direct response to requests made by Defendants for funds for specific items.  Plaintiff, however, failed to provide any evidence matching up specific requests for funds with an actual wire transfer, or what the funds were requested for, let alone what the funds were actually used for.

In 2004, in keeping with their ill-defined lending arrangement with Plaintiff, Defendants began demolition of the home at Casa Grande.  In the same year, Defendants acquired the properties at Roundhill Road and La Sonoma, both in Alamo,

10

California. Then, in 2005, Defendants acquired the properties at San Marcos Place in San Ramon, California, and Livorna Heights, in Alamo, California. See Joint Stipulation of Facts, Docket #90, Stipulated Fact #5, Exhibit A. All four properties acquired by Defendants during 2004 and 2005 were acquired using only Defendants' personal credit. Moreover, all four properties were titled in Defendants' name only. The record is clear that all four of the properties were financed solely with the monies lent by Plaintiff to Defendants.

To be clear, between 2004 and 2009, Plaintiff lent Defendants $5,275,000. See Joint Stipulation of Facts, Docket #90, Stipulated Fact #1. These funds were used not only to finance the initial acquisition of the four properties, but also to service the mortgages, pay real property taxes, and to finance the construction expenses on the four properties and on Casa Grande. The remaining funds were used to support Defendants and their family, and to provide capital for Defendants' LLC, Comfort Palace, LLC. See Forensic Accounting, expert Everett P. Harry's Report at Exhibit 64.[9] In formulating his opinion, Mr. Harry relied in part on Construction Consultant expert Pieter N. Dwinger's analysis of related construction expenses at Exhibits 58-63; Defendants' bank records; Defendants' 2007-2015 federal and state tax returns prepared by their CPA Kustov & Asoociates

---

[9]Mr. Harry acknowledged in his report that the documents he was provided and reviewed were sufficient to establish clearly what Defendants did with the money lent to them by Plaintiff. See Exhibit 64, Section II - Assignment and Overall Opinion.

11

at Exhibit 42; and the 2007-2016 corporate tax returns for Comfort Palace, LLC, also prepared by Kustov & Associates at Exhibit 43.

By 2008, when the Great Recession hit, none of the homes had been re-sold. In the same year, Plaintiff had Ibragim sign a Declaration of Receipt of Money in the amount of $4.7 million, reflecting funds Plaintiff had previously lent to Defendants. The Declaration of Receipt confirmed the money was to be paid back to Plaintiff upon the completion and sale of the real properties. See Exhibit 13-001.

Three years later, all five homes had still not been re-sold. So in August 2011, Plaintiff had Ibragim sign a second Declaration of Receipt of Money indicating a new balance including additional funds lent, for a total of $5.275 million. This second Declaration again confirmed the money that Plaintiff had lent would be re-paid upon completion and sale of the real properties. See Exhibit 14-001.

Finally, having not been repaid any of the money lent, in October 2013, Plaintiff had Defendants sign a promissory note to repay the $5.275 million. The promissory note required payment in four installments, with interest at 2% per annum from the date the funds were advanced. The first installment was due December 15, 2013. See Exhibit 38. Defendants failed to pay the first installment or any other installment under the promissory note.

Plaintiff lent Defendants an additional $123,790 between 2010 and 2014. Specifically, Plaintiff lent $5,000 in 2010,

12

$106,790 in 2013, and another $12,000 in 2014.[10] <u>See</u> Joint Stipulation of Facts, Docket #90, Stipulated Fact #1. These were separate loans from the previous loans totaling $5.275 million and referred to in the Declarations of Money Lent and in the Promissory Note. Once again, there were no written loan agreements documenting the terms and conditions of repayment of these additional loans. These additional loans remain unpaid.

From the Stipulated Facts, the properties located at Livorna Heights Road, 114 La Sonoma and 2946 Roundhill Road, Alamo, California, were all lost to foreclosure in 2011.[11] The property located at 3207 Casa Grande Drive, San Ramon, California, was lost to foreclosure in 2013. Finally, the property located at 84 San Marco Place, San Ramon, California, was likely lost to foreclosure sometime after October 2015. <u>See</u> Joint Stipulation of Facts, Docket #90, Stipulated Fact #5, Exhibit A.

## IV. Conclusions of Law

### A. Jurisdiction

The court has jurisdiction over this matter under 28 U.S.C.

---

[10]The $5,000 was lent for Ibragim to return to Kazakhstan to see his mother who was dying. The $106,790 and $12,000 were lent for the use of Defendants' LLC, Comfort Palace (Comfort Palace, LLC was involved in some sort of oil and/or fuel business venture in Venezuela, South America). Defendants and Plaintiff hoped the business venture would be profitable and generate funds to repay Plaintiff for the monies previously lent to Defendants. It did not.

[11]Plaintiff testified in 2011 she visited Defendants at their home in Roundhill, Alamo, California. She testified Defendants showed her the other four properties and informed her they were all rented out. Plaintiff testified she was not told that three of the properties had already been foreclosed.

13

§ 157 and 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (I) and (J).

**B.  11 U.S.C. § 727(a)(6)**

The court will dispatch the 11 U.S.C. § 727(a)(6) cause of action found in the caption of the complaint and prayer. Nowhere in the body of the complaint does it articulate, let alone reference a claim under 11 U.S.C. §§ 727(a)(6)(A), (B) or (C).[12] See Complaint at docket #1. Moreover, no evidence was presented at trial to support such a cause of action. Judgment will be entered in favor of Defendants on this cause of action.

**C.  11 U.S.C. § 727(a)(4)(A)**

Section 727(a)(4)(A) bars a debtor's discharge where the debtor "knowingly and fraudulently" makes a false oath or account. In re Totten, 2014 WL 690616, 5* (Bankr. D. Hawaii, February 20, 2014). Objecting creditor must prove with sufficient evidence that: (1) the debtor made a false oath or account in connection with a case; (2) the oath or account related to a material fact; (3) the oath or account was made knowingly; and (4) the oath or account was made fraudulently. Id. (citing In re Roberts, 331 B.R. 876, 882 (9th Cir. BAP 2005)).

---

[12]The manner in which the complaint was drafted is indicative of how Plaintiff's counsel presented the case. The questioning of parties and witnesses was far too often obtuse and irrelevant to the subject matter at hand. Moreover, Plaintiff's counsel failed to properly mark their exhibits, attach the correct copies or copies in all the exhibit books. Toward the end of Plaintiff's case-in-chief, the court had to spend an inordinate amount of time to clean up the evidentiary record from the many errors created by Plaintiff's counsel.

14

A debtor has a duty to prepare his schedules and statements carefully, completely, and accurately. In re Totten, 2014 WL 690616 at *5 (citing In re Mohring, 142 B.R. 389 394 (Bankr. E.D. Cal. 1992), aff'd, 153 B.R. 601 (9th Cir. BAP 1993), aff'd, 24 F.3d 247 (9th Cir. 1994)).

A false oath may involve a false statement or omission in the debtor's schedules or statements. In re Totten, 2014 WL 690616 at *5 (citing In re Willis, 243 B.R. 58 (9th Cir. BAP 1999)).

The fundamental purpose of § 727(a)(4) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations. In re Totten, 2014 WL 690616 at *5 (citing In re Willis, 243 B.R. at 63).

As explained by the Ninth Circuit, false oaths are material if they bear a relationship to the debtor's business transactions or estate, or concern the discovery of assets, business dealings, or the existence and disposition of the debtor's property. In re Totten, 2014 WL 690616 at *6 (citing Retz v. Samson (In re Retz), 606 F.3d 1189, 1198 (9th Cir. 2010)).

An omission or misstatement that "detrimentally affects administration of the estate" is material. In re Totten, 2014 WL 690616 at *6 (citing In re Willis, 243 B.R. at 63).

Fraudulent intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct. In re Totten, 2014 WL 690616 at *6 (citing In re Devers, 759 F.2d 751, 753-54 (9th Cir. 1985)).

15

A pattern of falsity can also clearly demonstrate fraudulent intent. <u>In re Totten</u>, 2014 WL 690616 at *6 (citing <u>In re Lum</u>, 2012 WL 909214 (Bankr. D. Hawaii 2012) (internal citations omitted)).

Concerning the debtor's schedules and statements, the veracity of these disclosures is essential to the successful administration of any bankruptcy case. <u>In re Totten</u>, 2014 WL 690616 at *6.

The complaint alleges that Defendants made numerous misrepresentations of fact at their initial creditors' meeting on September 8, 2015. Plaintiff's counsel, however, failed to provide the court with a printed copy of the transcript of the meeting of creditors and nothing offered at trial substantiated these allegations. As such, the record is devoid of any facts that would support such a cause of action. The court finds for the Defendants on the 11 U.S.C. § 727(a)(4)(A) cause of action.

**D.    11 U.S.C. § 727(a)(5)**

Under 11 U.S.C. § 727(a)(5), a debtor may not be granted a discharge if the debtor "has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." Section 727(a)(5) is broadly drawn and gives the bankruptcy court power to decline to grant a discharge in bankruptcy when the debtor does not adequately explain a shortage, loss, or disappearance of assets. <u>Seror v. Lopez (In re Lopez)</u>, 532 B.R. 140, 150 (Bankr. C.D. Cal. 2015) (citing <u>Aoki</u>

16

v. Atto Corp. (In re Aoki), 323 B.R. 803, 817 (1st Cir. BAP 2005)).

Under § 727(a)(5) an objecting party bears the initial burden of proof and must demonstrate: (1) debtor at one time, not too remote from the bankruptcy petition date, owned identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief granted, the debtor no longer owned the assets; and (3) the bankruptcy pleadings or statement of financial affairs do not reflect an adequate explanation for the disposition of the assets. In re Lopez, 532 B.R. at 150-51 (citing Retz v. Samson (In re Retz), 606 F.3d 1189, 1193 (9th Cir. 2010)).

Glaringly absent at trial was any evidence of identifiable assets that went missing and/or were unaccounted for. No evidence was introduced that this issue was raised by Plaintiff or the chapter 7 Trustee at the meeting of creditors, nor any other time while the case was being administered by the chapter 7 Trustee. In fact, the chapter 7 Trustee filed her Report of No Distribution on October 6, 2016. Additionally, Mr. Harry, Plaintiff's own expert and forensic accountant reported the available records he was provided were sufficient to enable him to determine what the Defendants did with the money lent to them by Plaintiff. See Exhibit 64, Section II - Assignment and Overall Opinion. As previously noted, Mr. Harry formulated his opinion based on Defendants' bank records, their federal and state tax returns for the years 2007-2015 prepared by Defendants'

17

CPA Kustov & Associates, the corporate tax returns for Defendants' LLC Comfort Palace for the yeras 2007-2016 also prepared by Kustov & Associates, and Plaintiff's Construction Consultant Expert, Pieter Dwinger's analysis of related construction expenses.

There was no evidence presented at trial to support a finding that Defendants failed to satisfactorily explain a shortage, loss, or disappearance of assets. Therefore, the court finds in favor of the Defendants on the 11 U.S.C. § 727(a)(5) cause of action.

**E.    11 U.S.C. § 523(a)(2)(A)**

Section 523(a)(2)(A) provides that, "A discharge under . . . this title does not discharge an individual debtor from any debt - (2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by - (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." To prevail on a claim under § 523(a)(2)(A), a creditor must prove five elements: "(1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct." Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 35 (9th Cir. BAP 2009) (citing Turtle

Case: 15-04118    Doc# 106    Filed: 07/30/18    Entered: 07/31/18 08:33:00    Page 18 of 29

Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000)).  The creditor bears the burden of proof to establish all five of these elements by a preponderance of the evidence.  Id.

As to this 11 U.S.C. § 523(a)(2)(A) cause of action, Plaintiff acknowledges that the allegation of Defendants' misrepresentation, fraudulent omission and/or deceptive conduct centered upon Plaintiff's assumptions regarding the underlying agreement for this "lending arrangement," including her assumption that one hundred percent (100%) of the $5.275 million lent to Defendants would go for the outright purchase of real properties (i.e., no debt financing) and construction-related expenses.  First, Plaintiff contends Defendants fraudulently failed to tell Plaintiff that they would be supporting their family with the loan proceeds.  Second, Plaintiff contends Defendants engaged in deceptive conduct by failing and/or refusing to provide Plaintiff with ongoing accountings of how the loan proceeds were used.  Finally, Plaintiff contends in 2011, Defendants failed to disclose to Plaintiff that three (3) of the properties had been foreclosed, while purporting to claim that four of the properties were rented out.

Plaintiff was a successful and sophisticated business woman. She wanted to get her money out of Kazakhstan and as she testified, put it to work in the United States.  Unfortunately, she chose to loan to Defendants, an unsophisticated couple who had no business experience in acquiring real property, with the

19

intent to demolish and rebuild, remodel or subdivide and resell the same at a profit. At the same time, this was the run-up to the "Great Recession."

At the outset of this ill-defined lending arrangement, the parties did not engage in any discussions, let alone reach any agreement, on how much money would be lent, how many or what real properties would be acquired, or how the purchase of real properties would be financed, nor were there any discussions regarding budgets for the construction projects. There were no discussions of the term and conditions of repayment; only that Plaintiff was to be repaid from sale proceeds when the properties sold.

There was no writing setting forth the parties' respective responsibilities under the business venture. No discussion, let alone a writing, on what terms and conditions monies would be lent. For example, would the request have to be in writing, setting forth the amount to be borrowed and for what purpose. No discussion on whether copies of real estate purchase contracts or copies of invoices for material and/or labor had to be first produced or immediately thereafter for such expenditures. There was no discussion, let alone a writing, restricting the use of the money lent or any certain deposit or reporting requirements for the money.

Plaintiff acknowledged during trial no interest was initially charged on the loan proceeds. Plaintiff did testify she was to be repaid when the property or properties sold, with

profit. Yet there was no discussion regarding what the profit split would be, let alone how it would be calculated. Plaintiff even testified that this was not to be her business, specifically testifying, "I'm not a participant in it. I wouldn't be able - - I wouldn't be able to oversee it. I live in a different country, in Kazakhstan, and not in America." See Trial Transcript, Day 1 at 80:21-81:2.

Plaintiff testified she thought before lending the money to Defendants that Defendants were financially well-off and that they owned their home at Casa Grande outright. Yet the Defendants made no such representations to Plaintiff orally or in writing. This was pure speculation on Plaintiff's part.

Plaintiff also asserted that she only advanced money upon a specific request by Defendants. Plaintiff failed to provide evidence regarding requests for money for specific items, or corresponding wire transfers, or what the money was ultimately used for. There were allegedly hundreds of wire transfers. Yet the court was provided with no evidence that requests for money for specific items were made, a corresponding wire transfer was made, and the money used for another purpose.

As for Plaintiff's contention that Defendants had to account to her for how the money she lent them was spent, no such requirement was ever agreed to orally or in writing. Again, there were no restrictions on the use of the money lent to the Defendants. If Plaintiff was dissatisfied with the Defendants' failure to account for the use of the monies loaned, she was free

21

to cease making any further advances.

As to Plaintiff's contention that the Defendants fraudulently omitted to tell her that they would not each be working full-time jobs once she began lending monies to them, there was no requirement to hold down a separate full-time job in order to borrow money from her. Once again, Plaintiff made an assumption that was unsupported by the record. This was no fault of the Defendants.

According to the stipulated facts, by 2009, Plaintiff had lent all of the $5.275 million to the Defendants. Additionally, in 2010, Plaintiff lent another $5,000 to Ibragim to visit his dying mother in Kazakhstan. Plaintiff claims that in 2011, when she was staying with and visiting the Defendants at the Roundhill house, they failed to inform her that three of the properties had been foreclosed, including the Roundhill house. Additionally, Plaintiff testified that the Defendants informed her all of the four other properties were rented.[13] Plaintiff testified the first time she learned of any foreclosure was in the summer of 2013 when she was informed by Fatima's mother that several properties had been lost in foreclosure.

Even after learning of the foreclosures, Plaintiff lent the Defendants another $106,790 in 2013, and $12,000 in 2014 for their business venture in Venezuela, with the hope that the

---

[13]This statement may very well be true. The court knows from its own experience, even after a foreclosure on a property rented out, a debtor often continues to receive rent payments until the bank takes actual possession of the property.

22

Defendants would earn money on the oil/fuel business venture and pay her back the other money she had already lent them.  Once again, there were no written loan documents or promissory notes.  See Trial Transcript, Day 1, at 133:18-134:3.

Unfortunately for all concerned, the business venture in Venezuela proved unsuccessful.  Plaintiff was not paid back for any of these funds as well.  Based on these facts, the court finds for the Defendants on the 11 U.S.C. § 523(a)(2)(A) cause of action.

**F.   11 U.S.C. § 523(a)(4)**

Section 523(a)(4) provides that "A discharge under section 727. . . of this title does not discharge an individual debtor from any debt - . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).

"Defalcation" is defined as the "misappropriation of trust funds or money held in any fiduciary capacity; the failure to properly account for such funds."  Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009) (citing Lewis v. Scott (In re Lewis), 97 F.3d 1182, 1186 (9th Cir. 1986)).

For purposes of this section of the Bankruptcy Code excepting a debt from discharge "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" requires a culpable state of mind involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior.  In other words, it requires a

23

showing of wrongful intent.  Bullock v. Bank Champaign, N.A., 133 S.Ct. 1754 (2013).

Under Ninth Circuit precedent, whether a relationship is a fiduciary one within the meaning of § 523(a)(4) is a question of federal law.  In re Weinberg, 410 B.R. at 28 (citing Ragsdale v. Haller, 780 F.2d 794, 795 (9th Cir. 1986).  In the dischargability context, the fiduciary relationship must arise from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt.  Id. (citing Ragsdale v. Haller, 780 F.2d at 796).  Whether a fiduciary is a trustee chargeable under § 523(a)(4) is determined by reference to state law.  Id.

To "embezzle" means willfully to take, or convert to one's own use, another's money or property, of which the wrongdoer acquired possession lawfully, by reason of some office or employment or position of trust.  BLACK'S LAW DICTIONARY (6th Ed. 1990).

Larceny is the unlawful taking and carrying away of property of another with intent to appropriate it to use inconsistent with the latter's rights.  U.S. v. Johnson, 433 F.2d 1160, 1163 (D.C. Cir 1970); see also, BLACK'S LAW DICTIONARY (6th Ed. 1990).

At trial, Plaintiff failed to provide any evidence that the Defendants committed fraud or defalcation while acting in a fiduciary capacity.  There was no evidence of an express or technical trust, let alone one that was imposed before and without reference to the wrongdoing that caused the debt.

24

Moreover, there was no evidence to support a finding of embezzlement or larceny. All of the money received by the Defendants from Plaintiff were in the nature of unsecured loans, with no restrictions on the use of the funds.

It is astounding that a sophisticated businesswoman like Plaintiff, dealing with unsophisticated people like the Defendants, would have lent this amount of money without any loan documentation. Nonetheless, all of the funds lent by Plaintiff to the Defendants, complete possession and title to the monies all transferred to the Defendants. Furthermore, Plaintiff testified at trial that she was not involved in the Defendants' business. Plaintiff was adamant this was not her business. As such, the court finds for the Defendants on the 11 U.S.C. § 523(a)(4) cause of action.

**G.    11 U.S.C. § 523(a)(6)**

Section 523(a)(6) prevents discharge "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). In Kawaauhau v. Geiger (In re Geiger), 523 U.S. 57 (1998), the Supreme Court made clear that for section 523(a)(6) to apply, the actor must intend the consequences of the act, not simply the act itself. Ormsby v. First American Title Co. Of Nevada (In re Ormsby), 591 F.3d 1199, 1206 (9th Cir. 2010) (citing In re Geiger, 523 U.S. at 60). Both willfullness and maliciousness must be proven to block discharge under § 523(a)(6). Id.

In the 9th Circuit, "§ 523(a)(6)'s willful injury

25

requirement is met only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct." In re Ormsby, 591 F.3d at 1206 (citing Carrillo v. Su (In re Su), 290 F.3d 1140, 1142 (9th Cir. 2002)).  The debtor is charged with the knowledge of the natural consequences of his actions.  In re Ormsby, 591 F.3d at 1206 (citing Cablevision Sys. Corp. V. Cohen (In re Cohen), 121 B.R. 267, 271 (Bankr. E.D.N.Y. 1990); In re Su, 290 F.3d at 1146 ("In addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action")).

A malicious injury involves: (1) a wrongful act; (2) done intentionally; (3) which necessarily causes injury; and (4) is done without just cause or excuse.  In re Ormsby, 591 F.3d at 1207 (citing Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1209 (9th Cir. 2001)).  Malice may be inferred based on the nature of the wrongful act.  In re Ormsby, 591 F.3d at 1207 (citing Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton), 942 F.2d 551, 554 (9th Cir. 1991)).

The money borrowed by the Defendants from Plaintiff was without any restrictions on its use by the Defendants.  There was a general understanding that some of the funds borrowed would be used to acquire real properties and either demolish and rebuild them or remodel them and attempt to re-sell them at a profit, repaying Plaintiff from the sale proceeds.

26

This was an ill-defined loan arrangement. As previously
noted, there were no upfront discussions as to how much money
would be borrowed, how many or what properties would be acquired,
how the purchase of real property would be financed, nor any
discussion of budgets for the construction projects. There were
no restrictions on the use of the money or depositing or
reporting requirements on the use of the money. Moreover, there
was no discussion of the terms and conditions of repayment of the
funds borrowed except when the property or properties were sold,
Plaintiff was to be repaid from the sale proceeds.

Furthermore, there was no discussion as to how Plaintiff
would be repaid if the property or properties did not sell or,
worse yet, were lost in foreclosure. It was not until October
2013 that Plaintiff had the Defendants sign a promissory note
which set forth repayment terms for the $5.275 million borrowed
by the Defendants from Plaintiff. The evidence presented at
trial established the Defendants acquired no less than five
properties, demolished and/or did major construction on three of
the properties, and some remodeling on one or two others.
Unfortunately, the properties did not sell. Like so many others
who acquired real properties in the early 2000s, with the hope of
reselling the same at a profit, when the Great Recession hit in
2008, fortunes were lost. In the case at bar, Plaintiff failed
to meet the burden of proof that the Defendants had any
subjective motive to inflict injury on Plaintiff. Nor did
Plaintiff prove by a preponderance of the evidence that the

27

Defendants believed that injury was substantially certain to result to Plaintiff from their conduct.

As to the remaining funds borrowed totaling $123,790, once again there were no loan documents, nor restrictions on the use of the money. Five thousand dollars was used by Ibragim to visit his dying mother in Kazakhstan, $12,000 to acquire a truck used by the LLC and another $106,790 for use by the LLC with the hope to generate funds to repay Plaintiff.

Based on all of the above, the court finds for the Defendants on the 11 U.S.C. § 523(a)(6) cause of action.

**V.   Conclusion**

For all of the foregoing reasons, the court finds in favor of Defendants and against Plaintiff on all causes of action. The court further finds that Defendants are entitled to a discharge in the underlying bankruptcy case and the debt owed to Plaintiff is dischargable. The court will issue a separate judgment in conformance with this Memorandum Decision. The Clerk's Office is directed to close this adversary proceeding upon entry of the judgment.

*** END OF MEMORANDUM DECISION ***

Case: 15-04118   Doc# 106   Filed: 07/30/18   Entered: 07/31/18 08:33:00   Page 28 of 29

1   <u>COURT SERVICE LIST:</u>

2   No Court Service Required

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                   29